**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| JOHN WARNER, | : | |
| Plaintiff, | : | |
| | | Case No. 3:07CV00127 |
| vs. | : | |
| | | District Judge Walter H. Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

**I.      INTRODUCTION**

Plaintiff John Warner suffers from various health problems including, but not limited to, heart palpitations, extreme dizziness, chronic migraine headaches, a recent history of a seizure-like disorder, and arthritis.  *See* Tr. 32, 82.  He stopped working in 2001 due to these health problems.  *See* Tr. 31-32.  He turned to the Social Security Administration for assistance on March 19, 2003 by filing an application for Supplemental Security Income (SSI).  A few weeks later, he filed an application for Disability Insurance Benefits (DIB).

After various administrative proceedings, Administrative Law Judge (ALJ)

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Thomas R. McNichols II found that Plaintiff is entitled to a period of disability beginning on July 1, 2005. (Tr. 33). But the ALJ concluded that before July 1, 2005, Plaintiff was not under a "disability" within the meaning of the Social Security Act, and he was therefore not eligible for DIB and SSI before July 1, 2005. (Tr. 37).

The ALJ's nondisability determination during the period of time before July 1, 2005, and the resulting denial of benefits during that time period ultimately became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks reversal of the ALJ's decision or, at a minimum, a remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     FACTUAL BACKGROUND

Plaintiff graduated from high school and completed three years of college. (Tr. 19). He served in the United States Navy as a boatswain from 1966 to 1970 and then worked for more than two decades as a machinist and metal fabricator. (Tr. 118).

When Plaintiff applied for SSI and DIB, and at the time of the ALJ's decision, Plaintiff's age (55 years or older) placed him in the category of a "person of advanced age" for purposes of resolving his disability applications. *See* 20 C.F.R. §404.1563(e),

*see also* Tr. 30.

Plaintiff's SSI and DIB applications state that his disability began on October 10, 2001. (Tr. 63). He explains in the present case that he has been disabled "since at least June, 2003, when his treating physician, Dr. Ahmed found functional limitations inconsistent with more than light work exertionally[.] At a minimum, he has been disabled since March 2004, when his migraine headaches began increasing in frequency." (Doc. #9 at 13).

Plaintiff testified during the ALJ's hearing that he last worked in October 2001. (Tr. 448). At the time of the ALJ's hearing, he was suffering from migraine headaches about 3 times per week, each lasting 2-3 hours. (Tr. 459). He obtained some relief by taking medication (Maxil). *Id*. He described the migraines as a "huge issue ... they just destroy me." (Tr. 458). He testified, "I just go to my room and shut the door and lay down, turn the lights out." (Tr. 459). Plaintiff viewed his migraines as probably the main problem impacting his inability to work. *Id*.

Plaintiff also suffers from seizures (Tr. 455), constant pain in his neck (Tr. 452), and arthritic pain in his hands, knees, and ankles (Tr. 453). Plaintiff's neck pain is primarily on the left side and back of his neck and radiates down his left arm, resulting in numbness and loss of grip strength. (Tr. 461). He estimated he could walk a distance of one block before experiencing dizziness and pain in his feet (Tr. 463), stand maybe about an hour, and sit probably for an hour. (Tr. 464). By the date of the ALJ's hearing, Plaintiff's arthritic pain had grown progressively worse; it was constant and would get

3

"worse at times." (Tr. 462). He estimated the severity of his typical pain at the level of 7 but it could reach up to 9 (presumably on the 0–10 pain scale, 10 being the most severe level of pain). *Id.*

The administrative record contains opinions about Plaintiff's work abilities from severe medical sources including Dr. Imtiaz Ahmed, Dr. Aijaz Ahmed, Dr. Padamadan, and Dr. Villanueva.

In June 2003, Dr. Imtiaz Ahmed completed a form listing Plaintiff's medical conditions as dizziness, dyspenia, palpitations, CVA (Cerebrovascular accident) (old), gastritis/GERD, back pain, CAD (coronary artery disease). (Tr. 243). Dr. Ahmed indicated that due to Plaintiff's multiple problems, he would be unable to stand/walk for more than four hours in an eight hour day or sit for more than four to six hours in an eight hour day. (Tr. 244). Dr. Ahmed thought that Plaintiff could lift up to 20 pounds, but he would be markedly limited in his ability to push/pull and moderately limited in his ability to bend. *Id.* And Dr. Ahmed concluded that Plaintiff would be unemployable twelve months or more. *Id.*

Dr. Aijaz Ahmed completed a form in July 2005 indicating that Plaintiff's ability to lift/carry is not affected by impairment (Tr. 407); he could occasionally lift 20 pounds and frequently lift 10 pounds (Tr 408); he could stand/walk for more than one-half hour a day; he could sit during an 8-hour workday without interruptions on any single occasion. (Tr. 408). Dr. Aijaz Ahmed opined that Plaintiff could perform "sedentary" work but

4

could not perform light work.[2] (Tr. 411).

At the request of the Ohio Bureau of Disability Determinations (Ohio BDD), Dr. Padamadan examined Plaintiff on June 23, 2003. (Tr. 230-37). Dr. Padamadan diagnosed a history of coronary artery disease, but he acknowledged that he did not have the results from a recent treadmill stress test. (Tr. 233). He also diagnosed transient ischemic attack (TIA) without residual changes. (Tr. 233). Dr. Padamadan summarized his findings as follows:

> [Plaintiff's] hearing and speech are normal. He is blind on the right eye and his vision is 20/50 in the left. His upper extremity functions for reaching, handling, fine, and gross movements are intact. He is able to sit, stand, and walk. Plaintiff may have difficulty climbing poles and ladders, and balancing on beams because of the history of dizziness.

(Tr. 233).

One month later, on July 29, 2003, Dr. Villanueva reviewed the record for the Ohio BDD. He opined that Plaintiff retained the ability to essentially perform medium work (lifting up to 50 pounds occasionally and 25 pounds more frequently). (Tr. 299). Dr.. Villanueva also commented that Plaintiff has a history of heart problems and stroke but noted that recent examinations demonstrated that Plaitniff had no residual problems from his stroke. (Tr. 299).

---

[2] Under the Regulations, those able to perform sedentary work are in the lowest category of work ability. *See* 20 C.F.R. §404.1567(a)-(e). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." §404.1567(a). Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

### III. ADMINISTRATIVE REVIEW

#### A. "Disability" Defined And The ALJ's Sequential Evaluation

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or he is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 29-33; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[3] Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations. Plaintiff met the insured-status requirement for DIB eligibility from October 10, 2001 through December 2006. *See Colvin*, 475 F.3d at 730; *see also* Tr. 31.

> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## B. The ALJ's Decision

In the present case the ALJ found at Step 2 that Plaintiff had the following severe impairments: "chronic migraine headaches, a recent history of a seizure-like disorder, and a history of high blood pressure." (Tr. 32). The ALJ determined at Step 3 that the severity of these impairments did not meet or equal a Listing-level impairment. *Id*.

At Step 4 the ALJ assessed Plaintiff's residual functional capacity before and after July 1, 2005 and concluded:

- Before July 1, 2005, Plaintiff could perform medium work with the following limitations: 'no climbing of ropes, ladders, or scaffolds; no more than occasional stooping, kneeling, crouching, or crawling; no exposure to hazards, such as dangerous machinery or unprotected heights; no exposure to extremes of hot, cold, or humidity; no exposure to respiratory irritants, such as gases and fumes; and restricted to performing simple, one- or two-step tasks requiring little, if any, concentration.'

- Beginning on July 1, 2005 and thereafter, Plaintiff could perform the light work with the same limitations he was subject to before then.

7

(Tr 32). This assessment, along with the ALJ's findings throughout his sequential, evaluation, led him to ultimately conclude that Plaintiff was under a disability beginning on July 1, 2005, but not before. (Tr. 33-34).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203

F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    PLAINTIFF'S DISABILITY ONSET DATE

### A.    Plaintiff's First Claimed Error

Plaintiff contends that the ALJ's selection of July 1, 2005 as his disability onset date was arbitrary because no medical evidence supported that finding and because the ALJ did not perform any of the analysis required by law as described in Social Security Ruling 83-20, 1983 WL 31249, concerning the inference of a disability onset date.

The Commissioner acknowledges that Social Security Ruling 83-20 constitutes a guideline for selecting a disability onset date.  The Commissioner contends that the factors sets forth in Ruling 83–20 do not favor Plaintiff and that the ALJ properly evaluated the evidence to find the disability onset date of July 1, 2005.

Once a finding of disability is made, Ruling 83-20 provides ALJs with legal criteria to determine a claimant's disability onset date.  *McClanahan v. Comm'r. of Social Security*, 474 F.3d 830, 833 (6th Cir. 2004); (citing *Key v. Callahan*, 109 F.3d 270, 274

9

(6th Cir. 1997)). "The onset date of disability is the first day an individual is disabled as defined by the [Social Security] Act and the regulations." 83-20, 1983 WL 31249 at *1.

Ruling 83-20 provides:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset *only if it is consistent with the severity of the condition(s) shown by the medical evidence.*

1983 WL 31249 at *1 (emphasis added). "Further, the ruling states that 'the medical evidence serves as the primary element in the onset determination.'" *McClanahan*, 474 F.3d at 833-34.

In Plaintiff's case, the ALJ established the disability onset date of July 1, 2005 as follows:

> The residual functional capacity established for the claimant, applicable to that period of time before July 1, 2005, is based primarily on the assessment of the [Ohio] BDD Medical Consultants. Recall that Dr. Villanueva and, upon reconsideration, Dr. Caldwell, determined that the claimant remained capable of performing work activities at the medium exertional level, with no climbing of ladders, ropes or scaffolds (Exhibit 14F)....
>
> As of July 1, 2005, and thereafter, the claimant's residual functional capacity has been reduced from medium to light. He has been given the benefit of doubt in this regard, due to the increased frequency of his migraine headaches, his recent history of a seizure disorder in 2004 and 2005 and the recent confirmation of rheumatoid arthritis. This more restrictive functional assessment comports with the functional limitations indicated by Dr. Ahmed in his July 1, 2005 assessment.

(Tr. 27-28).

Plaintiff specifically challenges the ALJ's decision to base his disability onset date on the July 1, 2005 report of his treating physician, Dr. Aijaz Ahmed. (Tr. 407-11). Plaintiff points out that the form itself required Dr. Ahmed to consider the medical history and chronicity of findings when assessing his work abilities. Thus, Plaintiff reasons, the ALJ erred by failing to consider that Dr. Ahmed July 1, 2005 opinions was based on Plaintiff's disability status before that date. And, since the record contains evidence about the existence of his migraines well before July 1, 2004, the more appropriate disability onset date is March 22, 2004 when Plaintiff complained of increasing dizziness and migraine headaches. (Tr. 420). Plaintiff also points to additional medical records to show his worsening headaches and migraines and changes in his prescription medication regimen after March 22, 2004. *See* Doc. #9 at 9. Plaintiff also contends, for reasons to be addressed in the next section of this Report, that the ALJ erred by not relying on Dr. I. Ahmed's report on June 6, 2003. (Tr. 242-44).

A review of the ALJ's decision reveals that he did not err as a matter of law and that substantial evidence supported the finding that Plaintiff's disability onset date was July 1, 2005. Although the ALJ did not cite Ruling 83-20, he considered the evidence in a manner consistent with the factors applicable to setting Plaintiff's disability onset date, particularly through his review of Plaintiff's medical records and the medical source opinions. *See* Tr. 27-28; *see also McClanahan*, 474 F.3d at 834 (ALJ did not err by failing to refer with specificity to Ruling 83-20).

In addition, Ruling 83-20's factors do not favor Plaintiff. The initial factor set out

in Ruling 83-20 concerns a claimant's statement as to when his disability began.  In his SSI and DIB applications, Plaintiff identified October 10, 2001 as his disability onset date.  He does not argue in this case that his initially proposed date in 2001 date was accurate.  That proposed earlier onset date does not favor his present assertions of either June 6, 2003, or March 22, 2004, as his disability onset date.

The date of October 10, 2001, however, does have some medical significance.  Plaintiff testified that he stopped working close to that date because a spider bit him, he contracted encephalitis as a result, and had to stop working.  (Tr. 448).  Plaintiff, however, is not alleging that he is disabled as a result of encephalitis.  Plaintiff's testimony also discounted another significant medical event – a heart attack – that he suffered in December 2001.  (Tr. 292-93).  Plaintiff testified that he was not suffering from significant cardiac problems, and he stated that he could not even claim that heart problems constituted a real issue for him.  (Tr. 451).

Despite the occurrence of those events in 2001, the second factor under Ruling 83-20 – work history, the date the claimant stopped working due to his impairment – does not assist Plaintiff because he not now claiming that he is under a disability due to encephalitis or because of his heart attack.

The third factor under Ruling 83-20 – medical and other evidence – does not assist Plaintiff in establishing an earlier disability onset date.  The medical evidence demonstrates that as recently as an emergency room visit that occurred on May 30, 2003, Mr. Warner was denying headache symptoms (Tr. 200).  Similarly, even a handwritten

12

treatment note dated March 22, 2004, does not suggest that the migraine headaches are of the severity that Mr. Warner has alleged.  The note from that date states only that he complained of headache and dizziness on and off.  Then, a parenthetical note states, "chronic mild." (Tr. 420).  This evidence of "chronic mild" headaches with on-and-off dizziness did not require the ALJ to set March 22, 2004 as Plaintiff's disability onset date. *See McClanahan*, 474 F.3d at 839-40 (presence of contrary evidence does not require reversal where substantial evidence supports ALJ's disability onset date).

      Plaintiff also supports his assertions regarding disabling migraine headaches by noting that he entered the emergency room on May 10, 2004 for migraine headaches.  While there, however, a physician, Nancy Farnlacher, M.D., initially described Plaintiff's appearance as "[v]ery non-toxic."  (Tr. 355).  Dr. Farnlacher obtained the results of a CT scan done one year prior to this admission and noted that it was normal.  (Tr. 355).  Dr. Farnlacher's neurologic examination showed that Plaintiff was alert, oriented times three, with clear speech, and normal strength in all four of his extremities.  (Tr. 355).  Dr. Farnlacher did not order any procedures or consultations for Plaintiff, and she reported that there was no critical care time involved in this emergency room visit.  (Tr. 356).  Dr. Farnlacher also commented that it was unlikely that Plaintiff had any serious intracranial pathology.  (Tr. 356).

      Although Plaintiff asserts that migraine headaches alone caused him to be under a disability on March 22, 2004, he bases that assertion solely on a subjective complaint to his physician.  Yet in May 2004, Dr. Farnlacher doubted the existence significant

13

intracranial pathology (Tr. 356), and her report undercuts Plaintiff's assertions regarding an onset in March 2004.

The reports of Plaintiff's next two emergency room visits, in June and September 2004, again reveal that his migraine headaches were not disabling. Plaintiff points out that in September 2004, he told his treating physician, Dr. I. Ahmed, that the headache or migraine medication, Imitrex, was no longer helping him. Yet, when Plaintiff entered the emergency room on June 24, 2004, Linda Rossel, D.O., described the course of this emergency room visit by noting that Plaintiff started out with a migraine, which progressed into some chest pain. (Tr. 362). Then, Dr. Rossel noted that the medication Lopressor completely relieved Plaintiff's chest pain and that pain medication completely relieved his headache. (Tr. 362). Although Dr. Rossell confirmed that Plaintiff had suffered a migraine, she further noted, "The patient is practically pain free after treatment." (Tr. 362).

When Plaintiff entered the emergency room on September 10, 2004, Sheri Gladish, M.D., expressed some concern about the low possibility of an intracranial hemorrhage (Tr. 379). Plaintiff, however, informed Dr. Gladish that he thought he was suffering from his typical migraine headache, and he told her that it usually resolved with pain medications, without difficulty. (Tr. 379).

Evidence submitted after July 1, 2005, casts further doubts on Plaintiff's assertions that his migraine headaches were disabling as of March 2004. On October 21, 2005, Amrit L. Chadha, M.D., ordered a magnetic resonance imaging (MRI) scan of Plaintiff's

14

brain. (Tr. 429). The MRI revealed no evidence of an acute infarction and no evidence of an intracranial hemorrhage or abnormal fluid collection. (Tr. 429). These findings would tend to support Dr. Farnlacher's statement from May 10-11, 2004, that despite Plaintiff's complaints of headache pain, she did not suspect that he had serious intracranial pathology. (Tr. 356). Thus, the MRI that Dr. Chadha ordered in October 2005 does not support an earlier disability onset date and provides further support for the ALJ's selection of July 1, 2005, as Plaintiff's onset date.

Accordingly, Plaintiff's first claimed error lacks merit.

**B.      Medical Source Opinions**

Plaintiff contends that the ALJ erred by failing to evaluate Dr. I. Ahmed's 2003 opinion as required by the Regulations. According to Plaintiff, the ALJ considered only whether Dr. I. Ahmed's opinions deserved controlling weight without continuing to weigh his opinions under the remaining factors required by the Regulations. Plaintiff further contends that the ALJ's failure to explain what factors led him to reject Dr. I. Ahmed's opinions, the ALJ's decision failed to meet the Regulation's mandate to provide good reasons for rejecting a treating physician's opinion.

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson*, 378 F.3d at 544; *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also*

20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

The ALJ declined to apply controlling weight to Dr. I Ahmed's opinion, finding not well supported by medically acceptable clinical and laboratory diagnostic techniques and finding it inconsistent with other substantial evidence in the record. *See* Tr. 28. The ALJ thus applied the correct legal criteria and provided specific reasons for not applying the treating physician rule to Dr. I. Ahmed's opinions. This, however, was not the end of the required analysis.

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

The ALJ applied the supportability and consistency factors when rejecting Dr. I. Ahmed's opinions and in doing so, the ALJ continued to weigh Dr. I. Ahmed's opinions as required by the Regulations. *See* Tr. 28. In addition, substantial evidence supports the

16

ALJ's rejection of Dr. I. Ahmed's opinions.  Two significant medical examinations occurred shortly after Dr. I. Ahmed filled out his form.  On June 11, 2003, Plaintiff had a chest pain work-up, a nuclear medicine cardiac stress test.  (Tr. 220-24).  He was able to exercise for three minutes and attain an exercise rate of 5.8 METs.  (Tr. 224).  Then, on June 23, 2003, less than three weeks after Dr. I. Ahmed opined that Plaintiff was "unemployable," Plaintiff saw Dr. Padamadan.  (Tr. 230-33).  He told Dr. Padamadan that he had suffered from migraine headaches in the past.  However, he also told Dr. Padamadan that his migraines cleared after he used Imitrex.  (Tr. 231). He also told Dr. Padamadan that his last episode of migraine headaches was four months before this examination.  (Tr. 231).  Thus, his statements to Dr. Padamadan on June 23, 2003, do not support Dr. I. Ahmed's earlier assessment on June 6, 2003 that Plaintiff was unemployable.  (Tr. 243-45).

On July 29, 2003, another physician, Dr. Villanueva, wrote a report concerning his review of the record.  (Tr. 298-302).  He opined that Plaintiff retained the ability to essentially perform "medium" work (lifting up to 50 pounds occasionally and up to 25 pounds more frequently).  (Tr. 299).  As Dr. Villanueva noted, although Plaintiff had a history of recent heart problems and a stroke, recent examinations demonstrated that he had no residual problems from his stroke.  (Tr. 299).  Dr. Villanueva referred to the stress test from June 2003 that showed an ejection fraction of 51% (Tr. 299, referring to Tr. 220).  Dr. Villanueva also referred to Dr. Padamadan's report to note that this examination showed no neurological deficits or muscle weakness and a normal ranges of

17

motion on testing (Tr. 299-300, referring to Tr. 231-33).

The ALJ reasonably adopted the findings of the state agency reviewing physician, Dr. Villanueva, over the brief opinions provided by Dr. I. Ahmed, to find that, before July 1, 2005, Plaintiff retained the abilities to perform medium work. (Tr. 27-28). The ALJ's acceptance of Dr. Villanueva's opinion was reasonable as that opinion took into consideration and referred to the recent stress test and the recent examination by Dr. Padamadan. (Tr. 299-300). Unlike Dr. Villanueva, Dr. I. Ahmed did not refer to any medical testing or to other medical opinions and did not provide any significant explanation of his opinions. (Tr. 243-44). Because Dr. I. Ahmed's June 6, 2003 form is not based on medical findings, is not well-explained, and is at odds with subsequent medical findings, the ALJ did err in favoring Dr. Villanueva's opinions.

Accordingly, Plaintiff's challenges to the medical source opinions lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.   The Commissioner's final non-disability determination before July 1, 2005 be affirmed; and

2.   The case be terminated on the docket of this Court.


August 4, 2008                                      s/ Sharon L. Ovington
                                                    Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).